## Case No. 1,223.

### BEECHER v. CLARK et al.

[12 Blatchf. 256; [1] 10 N. B. R. 385.]

Circuit Court, S. D. New York. July Term, 1874.[2]

FRAUDULENT CONVEYANCES — FROM HUSBAND TO WIFE—FAILURE TO RECORD DEEDS —INTENTION —KNOWLEDGE OF WIFE —BANKRUPTCY—RECOVERY BY ASSIGNEE — PROPERTY NOT SUBJECT TO CREDITOR'S LIEN.

1. A voluntary conveyance of real estate by the owner to his wife, by means of a deed from him to a third person, and of a deed from the latter to the wife, held · void, as having been made in fraud of the creditors of the husband.

[See note at end of case.]

2. The circumstance, that the deeds were not recorded until more than 18 months after they were made, and were then recorded the day before the failure in business of the firm of which the husband was a member, having been for sometime previously in his possession, commented on, as a badge of fraud.

[Cited in Clark v. Hezekiah, 24 Fed. 666.]

3. It is not necessary that the wife should have known of the fraudulent intent of the husband, to make void a voluntary conveyance to her, fraudulent on the part of the husband, as to creditors.

[See note at end of case.]

4. The husband [was] shown to have conveyed, by voluntary conveyances, to his children, for their benefit, and to his agent, for the grantor's benefit, during a period commencing soon after the deed to the wife was made, and ending immediately before the failure of the firm, real estate worth $60,000, as part of a scheme to set apart property for himself and his family, in fraud of his creditors. The real estate conveyed to the wife was of the value, at the time, of $132,-000, and the husband retained in his hands, (excluding the $60,000 of real estate conveyed to his children and his agent,) property of the net value of only $25,000. He was engaged in a business which he knew to be in an embarrassed condition, when the deed to the wife was made, he lived in the city of New York, he was not in harmony with his partner, and the real estate conveyed to his wife was his most valuable property, and was all he had that was immediately available and unencumbered.

[5. Cited in Re Duncan, Case No. 4,131, to the point that the assignee in bankruptcy can recover property conveyed by the bankrupt in fraud of his creditors, even if there was no lien on such property in favor of a creditor when the petition was filed.]

[See note at end of case.]

[In equity. Bill by John S. Beecher, assignee in bankruptcy of Abraham B. Clark, against Isabella Clark and others, to set aside certain conveyances made by the bankrupt in fraud of his creditors. Decree for complainant.

[The respondent subsequently appealed, and the supreme court remanded the .cause, with instructions to modify the decree. Clark v. Beecher, 24 U. S. Sup. Ct. Rep. (Lawy. Ed.) 705.] ·

Francis N. Bangs, for plaintiff.

Luther R. Marsh, for Mrs. Clark.

HUNT, Circuit Justice. The plaintiff is the assignee in bankruptcy of the defendant Abraham B. Clark, who, jointly with Abraham B. Bininger, his partner in the firm of A. Bininger & Co., was adjudged bankrupt in 1869. The object of the suit, as stated in the prayer of the bill, is to obtain a decree declaring certain conveyances, one made by the bankrupt to Thomas D. James, and the other (of the same property) by Thomas D. James and wife to the defendant Isabella Clark, void, and that the property conveyed thereby vested in the plaintiff, because conveyed in fraud of creditors. The bill of complaint alleges, as ground of impeaching these conveyances, that the conveyance to James was voluntary and without any actual consideration, and made in fraud of Clark's creditors, with intent to hinder, delay and defraud such creditors, and that that conveyance was kept secret; that the conveyance from James to Mrs. Clark, although executed and acknowledged by James on April 20th, 1868, was not actually delivered to Isabella Clark, and that that conveyance was kept secret, and was made in pursuance of the same secret trust, for the benefit of Clark, upon which said first mentioned conveyance was made by Clark to James; and, also, that the conveyance to Mrs. Clark was made in pursuance of said secret trust, and with intent to hinder, delay and defraud the creditors of Clark, and in fraud of all such creditors. A large amount of testimony has been taken, and the case now comes up on a final hearing.

The property in question consists of four lots of land on Park avenue in the city of New York, which, with the buildings upon them, were, in April, 1868, of the value of $132,000. On the 20th of April, 1868, the bankrupt, Clark, conveyed these premises to Thomas D. James, who, on the same day, with his wife, conveyed the same to the defendant Isabella Clark, wife of the bankrupt. These conveyances were dated and acknowledged on the day mentioned, but were not recorded until November 3d, 1869. The evidence of Clark is to the effect, that the deeds were actually delivered to Mrs. Clark, retained in her possession for several months, then by her delivered to him to be placed for safe keeping in the safe at the store of the firm, and, on the 3d of November, the day before the suspension of the firm, delivered by him to the proper officer to be recorded. Mr. Clark testifies, that he was advised by Mr. James, his friend and counsel, that the purpose of a record was only to secure the grantee against another conveyance by the grantor; that the conveyance was equally valid, whether recorded or unrecorded; and that he communicated to his wife this information from Mr. James, when he delivered the deeds to her. No value was paid by Mr. James or by Mr. Clark, at the time of delivering the deeds.

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Decree modified in Clark v. Beecher, 24 U. S. Sup. Ct. Rep. (Lawy. Ed.) 705.]

The plaintiff alleges, that this transaction was fraudulent in law and in fact; that it was made with intent to defraud creditors; that such was its natural and necessary operation; that the evidence shows an intent on the part of the bankrupt to provide for his future maintenance out of property which belongs to his creditors; and that, the conveyance being "in fraud of creditors," the title of the property is "vested" in the assignee, under the bankrupt act. In Sedgwick v. Place, [Case No. 12,621,] recently decided in this district, I had occasion to examine the law on this subject, and I shall not repeat what was there said.

Two further suggestions as to the law seem to be appropriate—1st. It is held by the New York court of appeals, in the recent case of Fox v. Moyer, 54 N. Y. 125, 131, that it is only when one makes a voluntary conveyance in good faith, with no intent to defraud creditors, that it will be upheld by proof that, when he made it, he retained an ample estate to pay all his debts. 2d. I cannot assent to the proposition, that it is necessary that the grantee should have known that the intent of the grantor was fraudulent, and that she should have been an intentional party to the fraud. I do not speak of the case of a bona fide purchaser for value. I mean to say, that, if Clark knew that he was insolvent, that he was giving to his wife that which he knew was needed for the payment of his debts, that he intended thereby to secure to himself a future provision and support from property which justly belonged to his creditors, the fact that his wife received a voluntary conveyance of the same, in ignorance of these facts, will not make the conveyance a valid one.

The fact that the deed was unrecorded for more than a year and a half, is important only as an evidence of fraud. If Clark and his wife supposed that the only value of a record was to prevent the effect of another deed by him, and the wife had confidence that he would make no other conveyance, the omission to record has no significance. If the intent was to allow Clark to play fast or loose, as he might find it to his interest, to own and transfer the property, if that was to his advantage, or, in the event of misfortune, to have it protected by a concealed conveyance to his wife, the occurrence is. much against the honesty of the transaction. A former unrecorded deed is referred to by both sides. In that case, Clark had made a deed to his wife of the Eighth street property, which was never recorded. He treated the property as his own, and at length sold it for the nominal sum of $20,000, taking in payment an interest in a gold mine in Virginia. Was it his purpose to treat the Park avenue property in the same manner? A jury might so infer and might deem it an evidence of fraud, to be considered with the other circumstances of the case. If the transaction were kept a secret, it would add to the gravity of the suspicion, while, if well known, the effect would be lessened by such knowledge and publicity.

I consider the conveyance of the Park avenue property to Mrs. Clark as a voluntary conveyance. The title or claim of Mrs. Clark to the Eighth street property was of a doubtful character, and the property had been sold by her permission. Any equitable claim of Mrs. Clark for its value, was or is upon the property received in exchange for it, and not in the nature of a claim on the Park avenue estate. The building of the Park avenue house was begun in 1855, and the house was completed and occupied in 1858. Everything remained in statu quo for ten years after its completion and occupation, and it was not until the occurrence of some disagreeable transactions between Mr. Bininger and Mrs. Fisher, related to Mrs. Clark by Mrs. Fisher, that she called upon her husband to fulfil his promise to convey the property to her. She did not require a conveyance in satisfaction of a debt due to her from her husband, or as an equivalent for the Eighth street property, or as a legal right, but to avoid, in the event of his death, the disagreeable circumstances that had happened to Mrs. Fisher upon the death of her husband. This is so stated by Mr. Clark himself. If Mr. Clark was indebted to his wife for money received belonging to her, the debt remained, after this conveyance, as it was before. General declarations by Mr. or Mrs. Clark of what was intended or expected to be done are of little value. Her title rests upon the deeds of April, 1868, and I think they were purely voluntary.

The pecuniary condition of Mr. Clark on the 20th of April, 1868, when the deeds were executed, is the first point to be considered. The plaintiff insists that his individual condition on that day was as follows—that he owed (1) on his Canal street property, $4,000; (2) that he was under a liability to or for the Texas and Wisconsin Improvement Company, to $30,000; (3) that he had received under the will of Agnes Clark, and which belonged to Mary Avery, up to August 11th, 1869, and which was unpaid, $13,000; (4) that, under the same will, and to the same date, he owed to Richard Clark, or his children, $14,326 69; (5) a judgment in favor of Mrs. Avery, on which was due $688 75; (6) a judgment in favor of Barnum, due, $283; (7) debt to Mrs. Mapes, $200; (8) the Damon note, $2,800; (9) that he had received, as rent, from the Chatham street property, No. 194, more than he had paid, $22,000, and No. 196, $15,000, of which two-thirds belonged to parties other than himself; (10) that, in 1861, he mortgaged his interest in the firm of Bininger & Co. to A. Bininger, for $45,000, that such amount had not been reduced by profits, and that he remained liable therefor, as a debt.

I am not certain that the last item, of $45,-000, is insisted by the plaintiff to be a debt

owing by Mr. Clark. An examination of the papers on which the point arises, satisfies me that the result of that transaction was simply this: Clark had used the notes of the firm, to $45,000, for his private purposes, which the firm then, or at maturity, paid. To right the wrong, as far as it would go, Clark sold and transferred to Bininger all his interest in certain real estate on Liberty and Thames streets, as well as in the firm business, substantially went out of the firm, and became a clerk, at $6,000 a year, the firm ostensibly remaining without change. This arrangement was to continue for five years. At the end of each year the net profits were to be ascertained, and, after allowing Mr. Bininger $7,000 a year, for interest on his capital, the residue was to be equally divided between Bininger and Clark. By a separate paper, Bininger bound himself, upon payment of the sum of $45,000, to retransfer to Clark his interest in the firm. The numerous provisions by which Clark's position was reduced to that of a clerkship, it is not necessary to detail. Mr. Bininger testifies, that, under this contract, no profits ever became due to Mr. Clark. This transaction does not create a debt. It is rather a payment or compromise of an existing debt, by the sale of all his interest in four pieces of real estate in the city of New York, on Liberty and Thames streets, and in the capital stock of the firm, by one partner to his associate. If Clark owed the firm $45,000 for the cause mentioned, he did not owe that sum to Bininger. He was himself an equal partner, and one-half of the debt was due to himself, as such partner. If, again, he was bound to pay Bininger $45,000, and re-enter the firm, while he would be charged with the sum paid, he would be entitled to a credit for the value of the firm interest, to be returned to him. What this value between 1861 and 1867 [1870] [3] would be, does not appear. This item of $45,000 cannot, I think, be properly set down in the account as a debt owing by Clark in April, 1868.

The accounts against Avery, Addoms [Adams] [3] and Clark result in this, that Clark was indebted, in April, 1868, to Mrs. Avery in about $13,000, subsequently reduced to $10,261, and to the Addoms family in $4,-364 22, the share of Mortimer having been paid in the summer of 1869, and to Richard M. Clark, or his family, in the sum of $14,-266 74.

The Wisconsin Improvement debts, of $30,-000, for which Clark had been responsible, had been paid before April, 1868, by the sureties for the company, Clark among them. All that remained of this transaction, at the date mentioned, was in the form of a note to Samuel Marsh, dated February, 1861, amounting, in April, 1868, to the sum of $1,584 28. There is a good deal of doubt about Clark's liability for this sum. There

[3] [From 10 N. B. R. 390.]

was also due on Mrs. Avery's judgment, $688 75, and on Barnum's judgment, $283.

The 9th item, of rents received from 194 and 196 Chatham street, is not correct, if intended to establish a separate debt. These items are properly to be considered as a part of the current accounts, at the date mentioned, and it may be said that the accounts show the result claimed. They are, however, but a part of the accounts between Mr. Clark and the representatives of his brother Richard and Mrs. Avery. Upon a settlement of all the accounts of Mr. Clark, including the rents of Chatham street, referred to, the balance against Mr. Clark, in favor of each of these parties, is as given under the heads 3, 4, and 5, above set forth. Charging Mr. Clark with the amount of those several items, as must be done, no other or further claim arising out of the estate of his mother can properly be made. The items above mentioned, of 3, 4, 5, 6, 7, and 8, were lawful debts due by Mr. Clark at the time of making the deed to his wife. His debts, at that time, amounted to $31,-298 44. The Canal street mortgage I shall deduct from the assets, when examining the value of his property.

The next inquiry is—what individual property did Clark possess at that date, viz., April 20th, 1868? The defendant insists that he was at that time abundantly solvent, with ample property (independent of that conveyed to his wife) to pay all his debts and leave a large surplus.

1. The first item of the property is that of eight thousand acres of land in Wisconsin. The cash value of these lands, if required to be turned at once into money, it would be difficult to fix. So far as it appears, the titles were perfect, the taxes were paid, and they were free from incumbrance. The fair value of these lands, as they are ordinarily sold, and as established by the witnesses for the plaintiff, together with about $3,500 in contracts for lands already sold, stated by Mr. Clark at $11,900, may be taken at $60,000.

2. The house and lot, 130 Canal street. The value of this is proved by Mr. Clark and Mr. Gardner to have been $20,000. It was subject to the incumbrance hereinbefore mentioned, of $4,000, and is to be carried out at $16,000.

3. The one-third interest in Nos. 194 and 196 Chatham street, which, according to Mr. Clark's evidence, rented for $10,000 per annum and repairs, and was worth $100,000. There is no other evidence on the subject. Mr. Clark's one-third interest was of the value of $33,333. This property is subject to a mortgage of $13,000, of which one-third is to be deducted from Mr. Clark's interest, viz., $4,333 33, leaving a value of $29,000, subject to the dower interest of his wife. I have no means of ascertaining the value of the dower, but take it, by conjecture, at one-sixth of the value, $4,866 66, leaving Clark's

interest in the property to be the sum of $24,133 34.

4. Mr. Clark also testifies, that there were debts due to him individually, amounting to $5,000, and that he had $1,000 cash in hand, making, for this item, $6,000.

5. A stipulation in the case shows, that Mr. Clark owned Velvet Company stock, of the value nominally of $5,000, but sold for $725, and that he was entitled to a legacy, under the will of his uncle, Thomas L. Clark, of $3.200, making an aggregate of $3,925.

6. There appears, by the report of the referee, made in the suit of Sarah E. Clark against Abraham B. Clark, to have been an overpayment to her of $1,660 73, "irrespective of any claim he might have upon her for the sum of $1,327 16, advanced for education and clothing of the children of Richard Clark." I do not see why this does not establish a claim for $1,660 73.

7. His Park avenue property was, at that time, worth the sum of $132,000.

The value of the property of Mr. Clark, owned by him individually, may be put at the sum of $248,585 73, the aggregate of the details last above set forth. Assuming the value of Mr. Clark's lands in Wisconsin to have been, as I have stated it above, a further question is made in relation to them. The evidence shows, that, by five deeds, the first one of which is dated September 24th, 1868, and the last November 1st, 1869, Mr. Clark conveyed these lands to his children and to his agent; that he owed his children but a few hundred dollars, and his agent but a small amount; and that he intended to give his children the value of the lands in excess of the debts, and intended that his agent, after indemnifying himself against certain liabilities, should hold the lands conveyed to him for the benefit of Mr. Clark. The first of these conveyances was made within five months after the conveyance to his wife, and nearly a year before that conveyance was recorded, the last one at about the time of the failure of the firm. Were these conveyances to his wife and to his children and agent a part of the same scheme? When he conveyed to his wife, did he intend to make the other conveyances which he afterwards did make? If so, the lands are not only not to be counted among his assets, but the fact tends to characterize the whole transaction as fraudulent. As I make it, Mr. Clark individually was indebted, at the time in question, in the sum of $31,298 44, and had property of the value of $248,585 73, leaving a balance in his favor of $217,287 29. If we hold the Wisconsin lands as not to be credited as a part of his estate, deducting their value, as estimated, $60,000, it leaves his estate $157,287 29. Of this he gave to his wife the Park avenue property, of the value of $132,000, retaining in value, for himself $25.287 29.

We come, next, to an examination into the affairs of the firm of A. Bininger & Co., of which Mr. Clark was a member. What was its condition on the 20th of April, 1868? The actual capital of the firm was never large. Bininger, Clark & Fisher succeeded Jacob Bininger in 1837, but it does not appear that either of them put any money into the business, or that they had any money. The business seems to have been reasonably profitable up to 1861. The events of the rebellion are said to have added to the value of their goods on hand. At that period, viz., 1861, the firm became embarrassed, and a suspension was threatened. Mr. Clark had used $45,000 of the notes of the firm for his private purposes, and then made the transfer of his interest to Mr. Bininger, of which notice has already been taken. The coal lands and gold mines, in which the firm property had been invested, were not productive, but made large drafts upon the profits made by the legitimate business of the firm. Mr. Bininger, when in Europe for a year and a half, had drawn upon the firm to the extent of $40,000, for private purposes. In November, 1869, the difficulties culminated in an open failure.

There is but little direct evidence of the condition of the firm in April, 1868. Its condition at the failure (November 4th, 1869) was fully proven, and we must reach a knowledge of its condition in April, 1868, by a comparison of the condition at that time and as it stood in November, 1869. The assets may be thus stated: (1) At the time of the suspension there was cash actually on hand, $4,735.38. (2) The stock of wines and liquors on hand is put by Clark and by Bininger at the value of $120,000. (3) In the same manner, the debts due to the firm are put at $35,000 to $40,000, say $35,000. (4) Andrew Bininger owed the firm, for money borrowed, the sum of $50,000. I should doubt whether this debt was of any real value. (5) The real estate in which the firm carried on its business. 92 and 94 Liberty street. I take Mr. Bininger's estimate of this value, and the circumstance that the property rents for $11.300. He puts it at $80,000 to $100,000, say $90,000, subject to a mortgage of $24,-000. This gives a net value of $66,000, of which the firm owned two-thirds, $44,000. (6) Nos. 18 and 20 Thames street. This property was sold at auction for $14,050, which was less than its value. I should judge it to be worth about $20,000, from which is to be deducted a mortgage of $4.000, being $16,-000 in value. Of this, two-thirds was owned by the firm, making $10.666. (7) The Briarport estate, in West Virginia, of 5,000 acres of coal and timber lands, estimated by defendants' counsel at $40,170. This property cost the firm from $65,000 to $70,000. Without going into an examination of the evidence, I content myself with saying, that I have read it all, and that I think $25,000 is a full allowance for the value of this item of property. (8) The Vaucluse mines, in Virginia, with the lands, farms, buildings and machinery connected therewith, put down by

the defendants' counsel at the sum of $25,-000. I think the full value of this property, $12,900, was obtained upon the sale in 1871. That sale was to the owner of adjoining property, and was extensively advertised.

Upon this statement, the assets of the firm, in November, 1869, stood thus: Cash, $4,-735 38; stock on hand, $120,000; debts due the firm, $35,000; Liberty street property, $44,000; Thames street property, $10,666; Briarport property, $25,000; Vaucluse property, $12,900—being a total of $252,301 38. The assets of the firm were reduced by the payment of $25,000 on account of Wagstaff, in August, 1869. The firm was better off by that amount in April, 1868, than it was in November, 1869. To the above amount of assets, should, therefore, be added $25,000, to ascertain the condition of the firm assets in April, 1868, making a result of $277,301 38. The actual results, in turning these assets into the means of paying the debts of the firm, by no means came up to this estimate.

As to the debts and liabilities of the firm of Bininger & Co. in November, 1869, the plaintiff's counsel, in his brief, states them at $220,000. The defendants' counsel states them at $216,510 67. The difference is not material for the purposes of the present suit. This indebtedness consisted of notes of the firm, issued between May 4th, 1869, and October 26th of the same year, and maturing in November of that year. To meet it, the firm had practically assets to the amount of $159,735 only, viz., cash, $4.735; stock on hand, $120,000; and debts due the firm, $35,-000, assuming such debts to be not only good, but immediately available. The other property consisted of real estate, of which the Liberty street portion was necessary for the transaction of its business, was already subject to a mortgage of $24,000, and was in the form of an undivided interest. The Virginia coal and gold lands were not in a condition to afford any considerable relief to the immediate necessities of the firm. The Thames street property was also mortgaged and consisted of an undivided interest. Nominally, the firm had a surplus of $66,125; practically, it was deficient to the extent of $56,775. The struggle for existence was continued during the year 1868 and the most of the year 1869, but was abandoned on the 4th of November of that year, at which time the failure of the firm was announced.

In ascertaining Mr. Clark's condition, as one of this firm, and whether made rich or poor by his connection with it, I am disposed to consider it an evenly balanced affair. No injustice is done if we say that the firm was able to take care of itself, and there leave it. The subsequent failure and unfortunate winding up of the firm will hardly warrant this conclusion, but I am inclined here to hold, that Mr. Clark stood as if not connected with the firm, that is, neither benefited nor injured in his pecuniary position, by being one of the firm of A. Bininger & Co.

Upon mature reflection, I am not able to satisfy myself that the motive of Mr. Clark, in not recording the deeds of April, 1868, to and from James, was an honest one. The idea of actual dishonesty was, perhaps, not present to his mind. He intended to stand before the world, before his partner, his sister, the children of his brother and his creditors generally, as the owner of this valuable estate. At the same time he intended to have it in a shape in which it would enure to the benefit of himself and his family, should that resort become necessary. His family would have called upon him to secure their debts, his general creditors would have become clamorous for payment, had they known the fact that he had conveyed his Park avenue property to his wife. Not being aware of it, they remained at ease, in reliance upon his ownership.

Neither am I able to satisfy myself as to the honesty of the conveyances of the Wisconsin lands to his children. These conveyances were substantially voluntary, they began within a few months of the voluntary deed to his wife, and they ended immediately before his open failure. The lands had been held by him for many years, and now, soon after the deed to his wife, and when the day of failure was rapidly approaching, he voluntarily conveys them to his children, for their benefit, and to his agent, for his, Clark's, benefit. Like the others, these deeds are left unrecorded. The deeds to his wife and to his children seem to me parts of a scheme to secure and set apart property for the benefit of himself, which justly belonged to his creditors, and which was necessary for the payment of their debts. Regarding them in this view, no part of the plan can be upheld. The Park avenue property forms a part of the scheme, and it must be deemed to have been fraudulently conveyed.

I have assumed, upon the evidence, that the affairs of the firm would take care of themselves, and that Clark individually had a surplus of property beyond his debts. That his firm and himself have gone into bankruptcy shows that this assumption was, probably, erroneous. The endeavor to protect his family by the means adopted, is very strong evidence that Clark did not believe this to be true, and that he wished to shield those he loved from results which he clearly foresaw. Living in the city of New York, subject to the great expenses necessarily there incurred, engaged in a business which he knew to be in an embarrassed condition, although nominally possessing property sufficient to pay its debts, not in harmony with his partner, he strips himself of his most valuable property, of all that is immediately available and unencumbered, by transferring it to his wife by a concealed conveyance. He follows this by conveyances to his sons and agent, of his remaining unencumbered property, by conveyances also concealed. These deeds are all voluntary. They were brought forth for rec-

ord only the day before the failure of the firm. The result is, if his views are carried out, that Clark's wife holds an estate in the city of New York worth $132,000, for which she paid nothing, and his sons hold the Wisconsin property, which he declares to be worth $70,000, and which I estimate at $60,000, for which but a few hundred dollars are paid, while his creditors are unprovided for.

It is with reluctance that I have reached the conclusion, that the conveyances to Mr. James and Mrs. Clark, of April 20th, 1868, are fraudulent, but such is my opinion, and I cannot do otherwise than to hold accordingly. [The conveyance was fraudulent as to the creditors. Mr. Clark did not leave himself an amount of property as large as he should have retained. On both of these grounds the prayer of this bill must be granted.] [4]

[NOTE. This case was appealed to the supreme court, which remanded the cause, with instruction to modify the decree. Clark v. Beecher, 24 U. S. Sup. Ct. Rep. (Lawy. Ed.) 705. Mr. Justice Swayne, in delivering the opinion, said: "We therefore deem it sufficient to say that we are satisfied with the judgment of the circuit court upon the main point brought before it for consideration. We think the conveyance complained of was properly condemned as fraudulent, and therefore held to be void. But it is equally clear that the personal decree against the appellant for the rents, issues, and profits, and the use and occupation of the premises, was erroneous."]